## Rooney v. Commonwealth.

(Decided February 10, 1922.)

## Appeal from Bell Circuit Court.

1. Homicide—Eye-Witness—Dying Declarations.—An eye-witness to a homicide or to a part of the occurrences at such homicide may testify on the trial to what he actually saw, and at the same time to a dying declaration of an injured person.

2. Homicide—Dying Declarations.—A statement by the injured person that he could live if he could just get his breath, made in connection with his statement that he was shot and could not get well, furnishes no evidence of hope upon his part that he could get well.

3. Homicide—Dying Declarations.—A statement by a witness that the injured person said: "He shot me for nothing," but which fails to relate anything the decedent said as to the manner in which the injuries were inflicted, or the facts and circumstances leading up to their infliction, is incompetent.

4. Homicide—Dying Declarations.—It is a rule of evidence that matters contained in a dying declaration are competent only if they would be competent coming from a living witness, and such a statement by the decedent unaccompanied by a statement of the facts and circumstances leading up to the difficulty is a mere expression of opinion and therefore incompetent.

5. Homicide—Dying Declarations.—Such evidence being merely an expression of opinion by the decedent, but strongly corroborative of what another witness had testified to with reference to the decedent's statement of facts as to how the difficulty occurred, but which is contradicted by other evidence, must be held prejudicial.

J. G. ROLLINS for appellant.

CHAS. I. DAWSON, Attorney General, and THOS. B. McGREGOR, Assistant Attorney General, for appellee.

OPINION OF THE COURT BY TURNER, COMMISSIONER—Reversing.

Appellant was indicted and charged with the murder of Ed Baker, and upon his trial was found guilty and given a life sentence.

His motion and grounds for a new trial having been overruled he has appealed.

Appellant was a deputy sheriff of Bell county and on Sunday morning, July 17, 1921, he left Pineville and went on a train a few miles to a mining camp. Shortly after his arrival at the mining camp his attention was directed in some way to the conduct of some boys in an empty box

car upon a switch. Among the boys was Ed Baker, about seventeen years of age and a large, well developed boy. In some way appellant gained the impression that Baker, who was larger than the other boys in the box car, was encouraging the smaller boys to fight, and appellant said to Baker in substance that he ought to stop encouraging those little boys to fight, whereupon Baker said to him that the boys were not fighting. In the course of the talk at the box car the question arose as to whether appellant was an officer, whereupon appellant notified Baker and the other boys that he was a deputy sheriff.

In the mining town Rufus Baker, the father of Ed Baker, operated a confectionery and soft drink stand in a house of three rooms which had been originally erected· for a dwelling house, and which was separate and apart from Rufus Baker's residence some hundreds of yards away.

Appellant, after leaving the box car, repaired to the restaurant and there made some small purchase and left; but thereafter, in an hour or two, returned to the soft drink establishment. In the meantime Ed Baker had gone to the place and informed his mother, and, as most of the evidence shows, in the presence of his father, that appellant had abused him over at the box car, and some of the evidence shows that he also referred to a former occasion at another place at which he claimed appellant had also abused him. Appellant and Joe Washington, a negro, were about that time in what is referred to as the back room of the house, and Rufus Baker's wife, according to some of the evidence for the Commonwealth, suggested that possibly appellant and Washington were in the other room drinking, and it is the theory of the Commonwealth that Rufus Baker went into that room only to see if that was true and that his son, Ed Baker, either followed him or went in with him. There is evidence, however, tending to show that when Ed Baker complained to his mother in the presence of his father of appellant's treatment of him, that Rufus Baker said: "I'll go and see about that," and that he and his son, Ed, then immediately went into the room where appellant and Washington were.

As to what occurred in the room the evidence is very contradictory; that of Rufus Baker and the dying statement of Ed Baker, hereinafter referred to, showing that appellant made some reference to Ed Baker's putting up

the smaller boys to fight in the box car, whereupon Ed Baker said that they were not fighting, and that appellant immediately drew his pistol and shot Ed Baker. The evidence, however, of appellant and Washington is to the effect that Rufus Baker got hold of each of them by the arm and began to upbraid appellant for his alleged mistreatment of his son and finally started to get his pistol, at which time Washington hastily left the room and the shooting immediately followed, there being five shots fired. Rufus Baker states that he had no pistol on that occasion and that the only pistol in the room was that of appellant, while appellant states that Rufus Baker fired the first three shots and shot off the forefinger of his left hand by the first shot. Rufus Baker's evidence that he had no pistol is in a measure corroborated by the statement of other witnesses who were in the house and nearby, that they had shortly thereafter searched the house and found no pistol, while the evidence of appellant is corroborated by the statement of Washington that at the time he left the room hastily Rufus Baker had started to and was about to draw a weapon and the first shot was fired immediately after he left the room.

. Appellant's evidence is that he fired no shot at Ed Baker but did fire two shots at Rufus Baker, and he says that neither of them struck Ed Baker, but that Ed Baker, who had hold of him (appellant) at the time Rufus Baker fired the first three shots, was struck by one or more of the shots from his father's pistol.

Mrs. Baker, the wife of Rufus and the mother of Ed, testified that she saw the latter part of the shooting, and in addition, testified that her son, who lived only thirty minutes after the shooting, told her he was killed and expressed no hope that he might recover, and then said to her that Rufus and Rooney were talking and Rooney said something about him, Ed, urging some little boys to fight in the box car and that he told Rooney the boys were not fighting and then Rooney began to shoot. Lawless, another witness, testified that Ed Baker told him that he was going to die, but afterwards said to him that he could live if he could just get his breath; and another witness, Hill, says that Ed Baker said in his presence that, ''He shot me for nothing,'' but fails to give any detailed statement of what Ed Baker said about the facts and circumstances of the shooting.

The first contention of appellant is that an eye-witness to a homicide, as Mrs. Baker testified she was, should not be permitted to also testify to the dying declaration of one who was fatally injured in such difficulty, and that such a declaration cannot be made competent by the testimony of an eye-witness to the homicide. No authority is cited on this question nor have we been able to find any, but we can see no sound reason why a dying declaration made by one injured in a difficulty, to an eye-witness to that difficulty, should be ruled out or made incompetent because of that fact. It might happen in many instances that an eye-witness to a difficulty or a part of it would be the only person near enough to receive the dying statement of one mortally injured; and if such witness had been the only eye-witness to the whole of the difficulty, he would be the only available person to receive a dying declaration from the one mortally wounded as to facts and circumstances not occurring immediately at the time of the difficulty, but which would furnish a motive for the commission of the crime.

But it is argued by appellant that the dying declaration as detailed by Mrs. Baker was incompetent because Lawless had testified that Ed Baker had expressed a hope of getting well. Lawless's evidence is that Ed Baker said that "he could live if he could just get his breath," a statement so obvious as to need no comment; but the fact that he made this statement in connection with the statement that he was shot and could not get well, only goes to emphasize and not to weaken his expressed conviction that he was going to die. Manifestly, this statement of the dead boy evidences no hope upon his part that he could get well.

But the evidence of Hill that Ed Baker said: "He shot me for nothing," presents a much more serious question. The witness did not undertake in connection with that statement to relate anything the decedent had said as to the manner in which his injuries were inflicted, or of the facts and circumstances leading up to their infliction, but only the unsupported statement that "He shot me for nothing."

It is a rule of evidence that matters contained in a dying declaration are competent only if they would be competent coming from a living witness, and it is perfectly plain that such a statement made by a living witness

would be wholly incompetent because it is in its essence a mere expression of opinion. Jones v. Commonwealth, 20 R. 355; Collins v. Commonwealth, 12 Bush 272.

The admission of this evidence by the witness, Hill, under the facts and circumstances of this case must be held prejudicial. The mother of the dead boy has testified to a competent statement from her son as to how his injuries were inflicted, and there is evidence for the defendant clearly and plainly contradictory of that statement of fact so given by her as coming from him; and it is altogether possible that but for this incompetent. evidence given by Hill—the mere expression of an opinion by the dead boy—a statement strongly corroborative. of what the mother had testified to, the jury might have taken a different view of the evidence on this subject.

Two witnesses, Walters and Prewitt, were permitted to testify to a conversation had by them with appellant at Pineville two months before this homicide, in which they say appellant told them he had been appointed a deputy sheriff and that he was a "good old rounder and never bothered anybody but there were two or three guys he wanted to kill and he would then be satisfied." There is no claim that the names of either Rufus or Ed Baker were called in this conversation, or that it had any reference to or relation to either of them in any fashion, and each of the witnesses say that they thought appellant was at the time joking.

The relevancy of this evidence is not apparent, and while we might not reverse the judgment on that account solely, on another trial it will be eliminated. Complaint is also made of the instructions, but if the instructions as copied at the end of the bill of evidence were the ones actually given we find no justification in the complaint; but if, as recited in the bill of exceptions, numbers 1 and 2 only were actually given then manifestly the instructions were incomplete.

We see no essential difference between the instruction which counsel for appellant contend should have been given and instruction number 5 as embraced in the bill of evidence. Shelton v. Commonwealth, 145 Ky. 543. For the reason indicated the judgment is reversed with directions to grant appellant a new trial and for further proceedings consistent herewith.