## Osborne v. Commonwealth.

(Decided April 25, 1933.)

C. A. NOBLE, L. D. LEWIS and J. L. DIXON for appellant.

BAILEY P. WOOTTON, Attorney General, and WILLIAM R. ATTKISSON, Assistant Attorney General, for appellee.

OPINION OF THE COURT BY CREAL, COMMISSIONER— Reversing.

Kelly Gibson, Ed. Gibson, Bill Robinson, Virgil Gibson, George Osborne, and Clarence Osborne were jointly indicted by the grand jury of Leslie county for

the murder of Charlie Napier. In one of the various counts in the indictment it is charged that the homicide was committed pursuant to a conspiracy between all the defendants. Virgil Gibson and Clarence Osborne were tried together, and the jury returned a verdict finding Gibson not guilty, but as to Clarence Osborne returned a verdict of guilty and fixed his punishment at imprisonment for life. He is prosecuting this appeal.

The homicide occurred at the home of Clarence Osborne at the mouth of Pig Pen branch on Hell-Fur-Sartin creek. Mrs. Susan Napier, mother of deceased, and his brother Monroe Napier, lived two or three hundred yards above the home of Clarence Osborne. On Sunday June 12, 1932, Charles and Monroe Napier, according to the evidence for the commonwealth, left the home of their mother shortly after the noon meal was served to go to a store to purchase some tobacco, and the road they followed led by the home of Clarence Osborne. When within about 40 yards of the Osborne home, they were fired upon. Monroe testified that two persons fired from a window in the upper story of the house and that another was firing from a window below. Altogether between 30 and 40 shots were fired. Both of the Napiers were shot from their mules, and Charles Napier received mortal wounds from which he died within a few hours after being carried to his mother's home. According to the evidence of Monroe Napier and his mother and other members of the family, Charlie and he were unarmed. He testified that he saw and recognized Kelly Gibson, Ed. Gibson, and Virgil Gibson at the windows and engaged in shooting. He is corroborated in practically every detail by a younger brother, who testified that he was sitting on the draw bars near his mother's barn from which point he had an unbroken view of the Osborne house and the surroundings. He was positive in his identification of the Gibsons.

It appears that Kelly and Ed. Gibson have previously been tried and convicted for this killing.

The uncontradicted and overwhelming weight of evidence shows that Clarence Osborne was not at his home at any time on the day of the killing. He left his home the day before and went to Hazard to take a sister to see a physician and to secure a load of merchandise for his store which he conducts at his home. It was his custom to haul goods from Hazard to Hyden

by automobile, but on account of bad roads they were transported from that point by wagon. He left a load of goods at the home of a friend at Hyden where his sister remained over night, and he went on to the home of his father, George Osborne, where he spent the remainder of the night and the following day. He testified that he stopped at his father's home because of an illness which confined him to bed practically all day Sunday. In this he is corroborated by a number of witnesses. As we gather from the record, it is approximately 7 miles from the home of George Osborne to that of appellant. It is conceded in brief for the commonwealth that there is no showing that Clarence Osborne was at his home at the time or during the day of the tragedy. In addition to what was pointed out in the brief for the commonwealth, one witness testified that Clarence Osborne tried to get him to change a statement relative to the ownership of a high-powered rifle. We have carefully read the entire record for evidence tending to show or from which a reasonable inference might be drawn that appellant had a part in a conspiracy to kill Charlie Napier, or was in any way connected with the commission of the crime. The evidence relied on in brief for the commonwealth is, in substance:

Ed. and Kelly Gibson work for Clarence Osborne, and they and their brother did the shooting from his home with guns owned by him. After the shooting they went to the home of George Osborne, where appellant was, taking the guns with them. Something over two months prior to June 12, Clarence Osborne had some difficulty or controversy with Clark Napier, a half-brother of Monroe and Charlie Napier, over a hog. One of the Gibson boys had disturbed a meeting at the home of Clark Napier by shooting a high-powered rifle, and Monroe Napier had asked Clarence Osborne to keep the gun away from the Gibson boys and not to let them shoot and disturb the meeting again. Monroe Napier testified that, after making this request of Clarence Osborne, the latter was mad at him.

Hazel Jones testified that Clarence Osborne, in talking to him about what he would testify on the trial, said that the Gibson boys did just what they ought to have done. Sam Jones testified that in February before the killing, George Osborne, father of appellant,

stated to him that Clarence had a good little piece of land if he could get rid of those Napier boys.

The commonwealth stresses an avowal made as to what this witness would have testified if permitted to answer a question relative to a statement made by Charlie Napier prior to his death. The avowal was that the witness would state that Charlie Napier said "People had told him that George and Clarence Osborne would have him killed and sure enough they did." Conceding that proper grounds had been laid for the admission of statements of deceased as a dying declaration, it is apparent that the matters contained in the avowal are incompetent. The general rule is that statements of a person in extremis are competent only if they would have been competent coming from a living witness. Rooney v. Commonwealth, 193 Ky. 723, 237 S. W. 403. This statement would not have been competent as coming from a witness, because the first part is purely hearsay and the remainder a mere conclusion.

The evidence for defendants conduces to show that, as the Napiers approached the Osborne house, they opened fire upon Kelly and Ed. Gibson and Bill Robinson, who were sitting on the porch; that some days before the homicide Monroe Napier took a 32 automatic pistol from another party, and there is evidence indicating that he had the pistol at the time of the killing. A number of witnesses testified to having seen bullet holes in the side of the house which appeared to have come from the direction from which the Napiers were approaching and to have been made by a pistol or gun of small caliber. Monroe Napier admitted that he had taken the pistol, but testified that it was out of repair and would not fire and further that he did not have it with him at the time. However, he is contradicted by the owner of the pistol and by other witnesses as to its being out of repair.

From the foregoing it will be seen that the evidence of the commonwealth tends to establish an unprovoked attack was made on the Napiers while that for the defendants indicates they acted in self-defense.

While a number of grounds are argued for reversal, the conclusion reached renders it unnecessary to give attention to all of them. It is argued that the commonwealth's attorney was guilty of misconduct in his

closing argument before the jury. It is made to appear that in the closing argument he said:

"When you turn Clarence Osborne loose, you turn loose one of the greatest plotters in this county. This is not the first man that was ever killed at the Osborne gate, others have fallen there too and the Osbornes have always gone free. On the records of the Leslie circuit court you will find the Osborne names, but never where one of them has been convicted."

Appellant was being tried for the crime charged in the indictment and not for other offenses which he or other Osbornes may have committed, and, in the circumstances, neither his criminal record nor that of his kinsmen was a proper subject for proof or argument except in so far as it related to this particular crime. In determining whether an improper remark to the jury constitutes prejudicial error, the appellate court must consider it in connection with the proven facts and circumstances in the particular case. Tiernay v. Commonwealth, 241 Ky. 201, 43 S. W. (2d) 661. Viewing this statement in the light of the proven facts and circumstances, it is at once apparent that it was highly prejudicial and calculated to and no doubt did prejudice the minds of the jury against appellant. Time and again this court has held that in his closing argument to the jury the commonwealth's attorney must necessarily be given the greatest latitude in stating the evidence and in arguing all reasonable deductions and inferences that may be drawn from it, but in this instance, where practically all the proof is as consistent with the theory of appellant's innocence as with his guilt, it was extremely prejudicial for the attorney to say that accused and his people had committed crimes similar to that charged in the indictment. Such conduct on the part of the commonwealth's attorney cannot be condoned nor excused, and we unhesitatingly hold that it was prejudicial to appellant's substantial rights.

A most careful scrutiny of the evidence, the substance of which we have recited will reveal little, if anything, of probative value conducing to connect appellant with the commission of the crime charged in the indictment. As we view it, the most damaging evidence against him was the statement of witnesses that he said "the Gibson boys did just what they ought to have

done." Considered in the light of the record, it is manifest that that statement was not an admission of guilt, nor is it sufficient to establish guilty connection with the crime. Any one who believed defendant's theory of the case which was supported by much evidence might have made the same remark and approved the course of the Gibsons in repelling the attack which they and others testified was being made upon them. The conclusion is inescapable that the evidence is not sufficient to support the verdict, and the court should have sustained appellant's motion for a directed verdict, and, in the event of another trial, if the evidence is practically the same, this should be done.

It is further argued that the conspiracy instruction is erroneous in that it did not use the words "in pursuance of said conspiracy," in connection with the words, "and while said agreement and conspiracy existed." There is merit in this contention, as is indicated in the case of Gambrell v. Commonwealth, 130 Ky. 513, 113 S. W. 476, and, in the event of another trial, that case will serve as sufficient guide in drafting the instruction. Since Virgil Gibson has been acquitted and will not again be tried with appellant, the alleged error in the other instruction complained of will not again occur.

For the reasons indicated, the judgment is reversed, and cause remanded for a new trial and proceedings consistent with this opinion.